## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **TYRONE GREEN,** | : | **CIVIL ACTION NO. 1:09-CV-0154** |
| | : | |
| **Plaintiff** | : | **(Judge Conner)** |
| | : | |
| **v.** | : | |
| | : | |
| **DET. SNEATH**, et al., | : | |
| | : | |
| **Defendants** | : | |

## MEMORANDUM

Plaintiff Tyrone Green ("Green" or "plaintiff"), a Pennsylvania state inmate incarcerated at the State Correctional Institution at Huntingdon ("SCI-Huntingdon") initiated this civil rights action pursuant to 42 U.S.C. § 1983, on January 26, 2009.  Named as defendants are the following individuals: Superintendent Raymond Lawler ("Lawler"); SCI-Smithfield Superintendent Jon Fisher ("Fisher"); Deputy Superintendent Corbin ("Corbin"); Lieutenant Thomas Holtz ("Holtz"); Lieutenant Cameron Kendrick ("Kendrick"); Corrections Officer Lewis Tress ("Tress"); Corrections Officer Melvin Settle ("Settle"); Corrections Officer Anthony Eberling ("Eberling"); Hearing Examiner Edward Mitchell ("Mitchell"); Father George Koharchik ("Koharchik") and Pennsylvania State Trooper Daniel Sneath ("Trooper Sneath").  Presently pending are cross motions for motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. For the reasons set forth below, plaintiff's motion (Doc. 117) will be denied and defendants' cross motion (Doc. 133) will be granted.  Also pending are the following

motions filed by Green: supplemental motion in limine (Doc. 110); motion for an

emergency injunction (Doc. 161); motion for supplemental complaint (Doc. 162);

and motion for discovery (Doc. 164).  The motions will be denied as moot.

## I.   Standard of Review

Through summary adjudication the court may dispose of those claims that do

not present a "genuine issue as to any material fact" and for which a jury trial

would be an empty and unnecessary formality.  See FED. R. CIV. P. 56(c).  The

burden of proof is upon the non-moving party to come forth with "affirmative

evidence, beyond the allegations of the pleadings," in support of its right to relief.

Pappas v. City of Lebanon, 331 F. Supp. 2d 311, 315 (M.D. Pa. 2004); FED. R. CIV. P.

56(e); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  This evidence

must be adequate, as a matter of law, to sustain a judgment in favor of the

non-moving party on the claims.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242,

250-57 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574,

587-89 (1986); see also FED. R. CIV. P. 56(c), (e).  Only if this threshold is met may the

cause of action proceed.  Pappas, 331 F. Supp. 2d at 315.

## II.   Statement of Material Facts

At all times relevant, Green was incarcerated at SCI-Huntingdon.  (Doc. 134,

¶ 1; Doc. 147, ¶ 1; Doc. 145, ¶ 1; Doc. 151, ¶ 1.)  On August 24, 2006, Pennsylvania

State Police Trooper Sneath was assigned to investigate a complaint by Green.

(Doc. 134, ¶ 3; Doc. 147, ¶ 3; Doc. 145, ¶ 3; Doc. 151, ¶ 3.)  On that same day, Trooper

Sneath met with Green at J.C. Blair Memorial Hospital and Green informed

Trooper Sneath that he was pushed down the steps by a corrections officer whom he could not identify.  (Doc. 134, ¶ 5; Doc. 147, ¶ 5.)  Green asked to look at photographs of the corrections officers who were working on that day so he could identify the culprit. (Doc. 134, ¶ 6; Doc. 147, ¶ 6.)

Following his discharge from the hospital, Green was transported to the State Correctional Institution at Smithfield ("SCI-Smithfield") to recuperate.  (Doc. 147, ¶ 7; Doc. 147, ¶ 7.)  While at SCI-Smithfield, he received three separate misconducts charging him with Threatening an Employee.  (Doc. 151, ¶ 4.)  He was found guilty of all charges and sanctioned to consecutive disciplinary custody in the Restricted Housing Unit ("RHU").  (Id.)

Green returned to SCI-Huntingdon on September 6, 2006, and he was placed in the RHU.  (Doc. 147, ¶ 7; Doc. 147, ¶ 7; Doc. 151-1, ¶ 4.)  While in the RHU, he sent an inmate request to defendant Fisher seeking to be released into general population.  (Doc. 145, at 7; Doc. 151-2, ¶¶ 3-4.)  Fisher responded stating, "I cannot give you a specific date as to the length of your RHU confinement.  I will tell you this, [sic] you will remain AC status until conclusion of PSP investigation.  Upon that a decision will be made based on various staff input."  (Id. at ¶ 3)  "As per Department of Correction policy, when an inmate alleges he was assaulted by staff, he is placed in Administrative Custody ("AC") for his safety pending an investigation.  The inmate remains on AC until the resolution of the investigation."  (Doc. 151-2, ¶ 4.)

On September 26, 2006, Trooper Sneath interviewed Green at SCI-Huntingdon.  At that time, Green gave Trooper Sneath a copy of the medical report from the J.C. Blair Memorial Hospital.  (Doc. 134, ¶ 10; Doc. 147 ¶ 8.)  Green also reported that he was mistreated while at SCI-Smithfield in that he was tortured and issued fabricated misconducts.  (Id.)

The next day, Trooper Sneath interviewed Corrections Officer Trainee Montgomery.  (Doc. 134, ¶ 11.)  Officer Montgomery reported that on August 24, 2006, he was escorting Green with Corrections Officer Hollibaugh.  (Id.)  Hollibaugh was behind Green to the left and Officer Montgomery was behind Hollibaugh.  (Id.)  He stated that he was more than an arm's length away from Green when Green stumbled and went down the stairs and that he was too far away to grab him and keep him from falling down the stairs and that neither he nor Hollibaugh pushed Green.  (Id. at ¶¶ 11-12.)  Officer Montgomery recalled that after Green fell, someone nearby had jokingly asked the officers why they pushed Green down the stairs.  (Id. at ¶ 13.)

After interviewing Officer Montgomery, Trooper Sneath states that he showed Green an array of photographs from which Green identified Officer Montgomery as the officer who escorted him and pushed him down the stairs.  (Doc. 134, ¶ 14).  Green, however, denies that he was shown any photographs and maintains that he was only escorted by one officer, and that was the same officer who pushed him down the stairs.  (Doc. 134, ¶ 15; Doc. 147, ¶¶ 14-15.)

On October 25, 2006, Trooper Sneath interviewed Officer Hollibaugh.  (Doc. 134, ¶ 16.)  Hollibaugh reported that he and Officer Montgomery escorted Green on August 24, 2006, and that he, Officer Montgomery and Green, who was handcuffed behind his back and walking slightly ahead of the two corrections officers, were proceeding on the second tier of the cell block in the RHU.  (Id.)  He stated that immediately before he reached the stairs, Green looked up to the third tier and yelled to another prisoner while still walking toward the stairs.  (Id. at ¶ 17.)  It appeared to Hollibaugh that Green misjudged the proximity of the first step, missed the next step, lost his balance and fell down the stairs.  (Id. at ¶ 18.)

On October 3, 2006, Green filed a civil lawsuit in the Court of Common Pleas of Huntingdon County related to the August 24, 2006 incident naming various corrections officers including Holtz and Fisher.  (Doc. 80-1, at 7.)

**A.      Retaliation**

        1.      <u>December 19, 2006 Interview</u>

Green was again interviewed by Trooper Sneath on December 19, 2006.  (Doc. 134, ¶ 19.)  Defendants contend that Trooper Sneath informed Green that he did not yet have sufficient information to arrest anyone (Doc. 134, ¶¶ 19-20), and that Green requested that Trooper Sneath close the investigation so that he could get out of the RHU (Doc. 151, ¶ 4).  According to Trooper Sneath, the investigation continued into February 2007, when he interviewed individuals employed at SCI-Smithfield in connection with Green's complaints. (Doc. 134, ¶¶ 21-25.)  Conversely, Green contends that during the interview, Trooper Sneath and Fisher threatened

that if he did not drop his complaint against Officer Montgomery, he would remain

in the RHU for the duration of the investigation, which could take years.  (Doc. 145,

¶ 4; Doc. 147, ¶¶  19, 21.)  He also contends that Trooper Sneath informed him that

the SCI-Smithfield employees were interviewed and that they had no recollection of

plaintiff.  (Id.)

Because Trooper Sneath did not find any evidence to corroborate Green's

claims that he was mistreated while at SCI-Smithfield, or that Officer Montgomery

pushed him down the stairs, the investigation was terminated on February 26, 2007.

(Id. at ¶¶ 25-26.)  Green was released from the RHU on March 1, 2007.  (Doc. 151, ¶ 5;

Doc. 151-1, ¶ 6.)

2.    <u>April 10, 2008 RHU placement</u>

On April 10, 2008, the Huntingdon County Court of Common Pleas denied

Greens motion for summary judgment.  (80-1, at 9.)  On that same day, he was

placed in administrative custody because he was charged with, or was under

investigation for, a violation of facility rules and there was a "need for increased

control pending disposition of charges or completion of the investigation."  (Doc.

149, ¶ 6; Doc. 145, at 10; Doc. 134, ¶ 27.)  He remained in administrative custody for

approximately three weeks.  (Doc. 145, ¶ 6; Doc. 149, ¶ 6; Doc. 151, ¶ 6.)  Because the

Security Office investigation did not produce enough evidence to warrant a

misconduct, he was released to general population.  (Doc. 134, ¶¶ 27-28; Doc. 134-3,

at 14; Doc. 151, ¶ 6.)

3.    <u>December 8, 2008 RHU placement</u>

On December 4, 2008, Officers Settle and Tress were sent to Green's cell by defendant Holtz. Holtz's reasons for dispatching the officers to Green's cell vary slightly. In an affidavit dated January 15, 2010, Holtz stated that he received a complaint about Green in the Security Office which prompted him to order an investigative search of Green's cell. (Doc. 80-1, ¶¶ 2-3.) The search uncovered contraband in the form of a razor, which resulted in the issuance of a misconduct. (Id. at ¶¶ 4-5.) When the officers attempted to transfer Green to the RHU pending further investigation, he refused. (Id. at ¶ 6.) He then threatened to cut himself with the razor. (Id. at ¶ 6.) Eventually, he agreed to be transferred to the RHU. (Id. at ¶ 7.)

In his July 12, 2011 affidavit, Holtz states that "[o]n December 4, 2008, based upon a complaint, I ordered Corrections Officers Settle and Tress to escort Tyrone Green to the Restricted Housing Unit ("RHU") pending an investigation concerning him." (Doc. 134-4, ¶ 6.) Green refused several orders directing him to place his hands through the pie-hole in his cell door so that he could be handcuffed. (Doc. 134, ¶ 31; Doc. 147, ¶ 8; Doc. 151, ¶ 8.) He became increasingly agitated and then grabbed a razor blade from his table and said, "I'm not going down like this. Come on in. Let's party then." (Doc. 134, ¶ 32; Doc. 147, ¶ 32; Doc. 145, ¶ 8; Doc. 151, ¶ 8.) Green placed the razor blade to his wrist and said, "I'm not going down like this." (Id.) Eventually he agreed to be handcuffed and escorted out of the cell; the razor blade was confiscated and taken to the Security Office. (Doc. 134, ¶ 33; Doc. 147, ¶ 33; Doc. 145, ¶ 8; Doc. 151, ¶ 8.) Because it was determined that Green was a

danger to himself, he was taken to the infirmary and placed on suicide watch and observed at fifteen minute intervals.  (Doc. 145, ¶ 9: Doc. 145, at 14, 20.)

On December 5, 2008, Green was issued what he describes as a fabricated misconduct charging him with threatening an employee, refusing to obey an order, and possession of contraband in the form of a weapon.  (Doc. 145, at ¶ 10; Doc. 145, 14.)  He was released from the infirmary on December 8, 2008, and taken to the RHU.  (Doc. 145, ¶ 11; Doc. 151, ¶ 11.)

### 4.   December 16, 2008 RHU transfer

On December 16, 2008, Green was escorted to a different RHU cell by defendant Eberling.  (Doc. 145, ¶ 12.)  Green alleges that during the transfer, Eberling commented "aren't you the one that got Officer Montgomery in trouble." (Doc. 149, ¶ 13.)  During this transfer, his Quran was left behind and thrown in the trash.  (Doc.  134, ¶ 35; Doc. 147, ¶ 35.)

On December 17, 2008, Green filed a grievance charging that defendant Eberling purposely left his Quran behind and that it was discarded.  (Doc. 145, ¶ 13; Doc. 134, ¶ 44.)  On January 13, 2009, grievance officer defendant Kendrick responded to the grievance as follows:

> Your Qur´an was left in the cell when you were moved out.  You packed your cell property and were responsible for making sure you had all your belongings prior to moving.  Once you moved out of the cell, the officers who were moving the next inmate into the cell cleared out any remaining items that were left in the cell.  All items that were left in the cell were considered trash and removed from the cell.
>
> Iman Erogan talked to you on the 17th and furnished you with a Qur´an. I talked to Father Koharchik on the 18th.  He informed me that they are

> making an effort to replace the Qur´an with the same version that you had.
>
> As far as the damages that you are requesting.  I can not see how anyone but yourself could be responsible for your Qur´an being left in your cell but yourself.  I suggest the next time you move to make sure you have all your property prior to moving out of the cell.  I find your grievance without merit.

(Doc. 145, at 15.)  Because Green was dissatisfied with this response, he filed an

appeal.  Defendant Lawler responded in the following manner:

> In your appeal, you repeat your claims from your initial grievance and state it was the officers' responsibility to ensure that your Quran was not left behind.  Lt. Kendrick investigated your complaint and found that your Quran was left behind when you were moved to another cell and it was destroyed.  This was not done deliberately or maliciously, and there was no attempt at religious discrimination.  In fact, the Chaplaincy Department was contacted, and you were provided another Quran.  In addition, I have been informed that the Chaplaincy Department has ordered you a Quran that is the same version of the one which was destroyed.  There will be no cost to you for this replacement.  When it comes in, it will be delivered to you.  I find that even though staff did destroy your Quran, every effort is being made to replace it with the same version.  Your request for the officers' names who threw your Quran away is denied as is your request for $50,000.

(Doc. 80-1, at 54; Doc. 132, ¶ 47-48; Doc. 145, ¶ 14; Doc. 147, ¶ 48.)  Defendant Corbin

was copied on this response.  (Doc. 80-1, at 54.)  His final level of appeal to the

Secretary's Office of Grievances and Appeals was resolved in the following manner:

"Although your Quran was accidentally destroyed, the institution made every effort

to replace it.  The record reflects that the religious department has ordered you the

same type of Quran that you had.  The institution was contacted and it was

reported that your Quran was ordered and as soon as it arrives you will receive it.

Therefore, this issue is considered resolved.  You have not provided any proof that

the officers deliberately left you Quran in your cell so that it could be placed in the trash." (Doc. 80-1, at 57.)

B.    **Religious Discrimination**

Upon learning of the loss of Green's Quran during the December 16, 2008 transfer, defendant Kendrick contacted the Iman for assistance in replacing the Quran. (Doc. 134, ¶ 36.)  The Iman immediately provided Green with a Quran, but it was not the same translation from which he practiced his faith. (Doc. 134, ¶ 37; Doc. 147, ¶ 37.)  On December 17, 2008,  he sent a request to the Iman stating that "You said that you would order me the translation of the Quran that I had that the guards in the RHU threw in the trash. . . ."  (Doc. 80-1, at 55.)  On December 22, 2008, the Iman responded that "I think there was a misunderstanding.  None of the DOC employee disrespect our holy books.  Maybe it was accident.  I already informed them this is something very serious in Islamic tradition.  They will be more careful after that.  Your book request is in process.  I have submit it last week."  (Id.)

In February 2009, Green filed another grievance charging that the Office of Grievances and Appeals and the chaplains at SCI-Huntingdon lied to him when they represented that they ordered a new Quran.  (Doc. 80-1, at 58.)  Defendant Superintendent Lawler responded to the grievance indicating that the Business Office's misunderstanding of the resolution of the original grievance resulted in a $38.00 credit to his inmate account rather than an order for a replacement Quran. (Id. at 59.)  The misunderstanding was resolved and a replacement Quran was ordered.  (Id.)   Corbin was copied on this response.  (Doc. 80-1, at 59.)  He received the new Quran sometime prior to April 21, 2009.  (Doc. 134-3, at 16.)

### C.      Due Process Violations

Green contends that the misconduct report issued on December 5, 2008, for threatening an employee, refusing to obey an order and possession of contraband (weapon) was fabricated.  (Doc. 145, ¶ 10.)  At the December 9, 2008 misconduct hearing Green complained that he did not receive notice of the charges against him because he was not provided a copy of the misconduct twenty-four hours prior to the hearing.  (Doc. 145, at 20.)  However, defendant Mitchell noted that because he was prohibited from having paperwork in the observation cell he was read the report and that under the circumstances, this constituted sufficient notice of the charges.  (Id.)  The hearing proceeded and Green pled guilty to the possession of contraband charge and not guilty to the other charges.  (Id.)  The hearing examiner concluded that he "was NON-compliant, made a threat and possessed a weapon," found him guilty, and sanctioned him to sixty days disciplinary custody.  (Id.)

### D.      Access to the Courts

Green states that on December 19, 2006, Trooper Sneath denied him the opportunity to pursue criminal charges when he threatened him into dropping the criminal complaint against Officer Montgomery.  (Doc. 147, ¶¶ 21, 26.)

## III.   <u>Discussion</u>

Section 1983 of Title 42 of the United States Code offers private citizens a cause of action for violations of federal law by state officials.  <u>See</u> 42 U.S.C. § 1983.  The statute provides, in pertinent part, as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . .

Id.; see also Gonzaga Univ. v. Doe, 536 U.S. 273, 284-85 (2002); Kneipp v. Tedder, 95 F.3d 1199, 1204 (3d Cir. 1996). To state a claim under § 1983, a plaintiff must allege "the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." West v. Atkins, 487 U.S. 42, 48 (1988).

### A.   Retaliation

Green alleges a number of retaliation claims. The First Amendment offers protection for a wide variety of expressive activities. See U.S. Const. amend I. These rights are lessened, but not extinguished in the prison context, where legitimate penological interests must be considered in assessing the constitutionality of official conduct. See Turner v. Safley, 482 U.S. 78, 89 (1987). Retaliation for expressive activities can infringe upon an individual's rights under the First Amendment. See Allah v. Seiverling, 229 F.3d 220, 224-25 (3d Cir. 2000). To prevail on a retaliation claim under 42 U.S.C. § 1983, plaintiff must demonstrate (1) that he was engaged in protected activity; (2) that he suffered an "adverse action" by government officials; and (3) that there is "a causal link between the exercise of his constitutional rights and the adverse action taken against him."

Rauser v. Horn, 241 F.3d 330 (3d Cir. 2001) (quoting Allah, 229 F.3d at 225).  The last

Rauser prong requires a prisoner to establish a causal link between the exercise of

his constitutional rights and the adverse action taken against him.  The court

employs a burden-shifting regime to determine whether a causal link exists.  The

prisoner bears the initial burden of proving that his constitutionally protected

conduct was a substantial or motivating factor in the decision to discipline him or

retaliate against him.  See id. (citing Mount Healthy City Sch. Dist. Bd. of Educ. v.

Doyle, 429 U.S. 274, 287 (1977)).  The burden then shifts to the defendants to prove

by a preponderance of the evidence that they would have taken the same

disciplinary action even in the absence of the protected activity.  See id.  If

defendants prove that they would have made the same decision absent the

protected conduct for reasons reasonably related to a legitimate penological

interest, they will prevail in the retaliation action.  See id. at 334.

1.     December 19, 2006 Interview

Green claims that he was retaliated against on December 19, 2006, when

defendants Trooper Sneath and Fisher threatened him and forced him to drop the

criminal investigation against Officer Montgomery or risk staying in the RHU until

the conclusion of the investigation, which could take years.  (Doc. 143, at 2.)

This claim is barred by the statute of limitations.  Federal civil rights statutes

do not contain a specific statute of limitations for § 1983 actions.  Therefore, the

district court utilizes the appropriate state statute of limitations.  See Wallace v.

Kato, 549 U.S. 384, 387-88 (2007).  "The statute of limitations for a § 1983 claim

arising in Pennsylvania is two years." <u>Kach v. Hose</u>, 589 F.3d 626, 634 (3d Cir. 2009); <u>see</u> 42 Pa. Cons. State § 5524(2).  A cause of action accrues when a plaintiff knew or should have known he was harmed.  <u>See</u> <u>Garvin v. City of Phila.</u>, 354 F.3d 215 (3d Cir. 2003).

It is undisputed that Green's retaliation claim arose on December 19, 2006.  It is also undisputed that this action was commenced by the filing of a complaint on January 26, 2009.  Consequently, this claim is barred by the statute of limitations and defendants Trooper Sneath and Fisher are entitled to summary judgment.

Notably, even if the claim was timely filed, Green would still not prevail.  It is well established that "a private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another." <u>Linda R. S. v. Richard D.</u>, 410 U.S. 614, 619 (1973).  Accordingly, Green had no constitutionally protected right to file a criminal complaint.  <u>See</u> <u>Lane v. Carpinello</u>, No. 9:07-CV-751, 2009 WL 3074344, at *27 (N.D.N.Y., 2009, Sept. 24, 2009).  If he were to overcome this hurdle, and meet all other elements, he would still not prevail because it is clear from the record that defendants would have made the same decision absent protected conduct.  "As per Department of Correction policy, when an inmate alleges he was assaulted by staff, he is placed in Administrative Custody ("AC") for his safety pending an investigation.  The inmate remains on AC until the resolution of the investigation." (Doc. 151-2, ¶ 4.)  Green was specifically informed that he would remain in the RHU pending completion of the Pennsylvania State Police investigation.  (Doc. 34-2, at

20.)  Trooper Sneath's investigation did not conclude until February 26, 2007.

Green was released from the RHU on March 1, 2007.

      2.     <u>April 10, 2008, December 8, 2008, and December 16, 2008, RHU Transfers</u>

     Green argues that defendants retaliated against him for pursuing a criminal

complaint against Officer Montgomery and for filing a civil action against

corrections officers in state court by being placed in the RHU on April 10, 2008, and

December 8, 2008, and by being moved from one RHU cell to another on December

16, 2008, and destroying his Quran.  As noted above, pursuing a criminal complaint

does not constitute protected conduct.[1]  However, the filing of a lawsuit and access

to the courts is protected conduct covered by the First Amendment.  <u>See</u> <u>Mitchell v.

Horn</u>, 318 F.3d 523, 530 (3d Cir. 2003); <u>see</u> <u>also</u> <u>Allah</u>, 229 F.3d at 224 (noting that it

is well settled that "prisoners have a constitutional right to access to the courts");

<u>Peterkin v. Jeffes</u>, 855 F.2d 1021, 1036 (3d Cir. 1988); <u>Cook v. Boyd</u>, 881 F. Supp. 171,

176, n. 4 (E.D. Pa. 1995).  Therefore, Green was clearly engaged in protected

conduct.

---

[1] If Green's pursuit of criminal charges against Officer Montgomery were considered protected conduct, and his placement in the RHU constituted adverse action, he would still fail on the third prong.  He cannot establish causation because the timing of this criminal complaint; the adverse action is not unduly suggestive. In fact, there is a gap of approximately twenty-one months.  Green initiated the criminal complaint on August 24, 2006.  The investigation into the criminal complaint concluded on February 26, 2007.  The adverse action of which he complains took place on April 10, 2008, December 8, 2008 and December 16, 2008.

Once it is determined that the inmate was engaged in protected conduct he must demonstrate that he has suffered some adverse action at the hands of prison officials.  See Rauser, 241 F.3d at 333 (citing Allah, 229 F.3d at 225).  To show an "adverse action," the plaintiff must demonstrate that defendants' actions were "sufficient to deter a person of ordinary firmness from exercising his [constitutional] rights."  Allah v. Al-Hafeez, 208 F. Supp. 2d 520, 535 (E.D. Pa. 2002), quoting Allah, 229 F.3d at 225.  Greens allegations that he was placed in the RHU for filing a civil lawsuit is sufficient to constitute adverse action.

In analyzing the third element the court must determine whether there is a causal connection between the exercise of the constitutional right and the adverse action.  The plaintiff must show that the protected activity was a substantial motivating factor in the state actor's decision to take the adverse action.  This "motivation" factor may be established by alleging a chronology of events from which retaliation plausibly may be inferred.  Tighe v. Wall, 100 F.3d 41, 42 (5th Cir. 1996); Goff v. Burton, 91 F.3d 1188 (8th Cir. 1996); Pride v. Peters, 72 F.3d 132 (Table) (7th Cir. 1995).  It is plaintiff's burden to prove that defendants were motivated by retaliation.  Hannon v. Speck, No. 87-3212, 1988 WL 131367, at *4 (E.D. Pa. Dec. 6, 1988) ("In bringing a § 1983 action alleging such retaliation, an inmate faces a substantial burden in attempting to prove that the actual motivating factor . . . was as he alleged.") (internal quotes and citation omitted), aff'd, 888 F.2d 1380 (3d Cir. 1989) (Table).  Where the prisoner seeks to establish this causal link based upon the temporal proximity between the protected conduct and the alleged retaliatory

act, "the timing of the alleged retaliatory action must be unusually suggestive before a causal link will be inferred." Krouse v. American Sterilizer Co., 126 F.3d 494, 503 (3d Cir.1997); Rauser, 241 F.3d at 334; see also Thomas v. Town of Hammonton, 351 F.3d 108, 114 (3d Cir. 2003) (concluding that the temporal proximity, nearly six months, is not unduly suggestive and does not sufficiently establish any causal link).

Green's claims fail on this prong. He relies on the state court's order of April 10, 2008, entered in the civil lawsuit in the Court of Common Pleas of Huntingdon County to establish causation for Holtz's decision of the same date to transfer him to the RHU. This is both implausible and not indicative of retaliation. As of April 10, 2008, the state court action had been pending for approximately eighteen months. During that time, there was ongoing discovery and motion practice which would require the involvement of Holtz as a party to the action. (Doc. 80-1, at 7-9.) The April 10, 2008 decision was *favorable* to Holtz and would not suggest a retaliatory response. Moreover, it is quite unlikely that defendant Holtz would have been aware of the order on the very day it was issued as the county court docket indicates that notice of the order was made *via* mailing to the addresses of record. (Doc. 80-1, at 9.) For all of these reasons, Holtz is therefore entitled to an entry of summary judgment on this claim.

Even if Green satisfied the causal link prong, it is clear that Holtz would have made the same decision. According to the record, Green was placed in administrative custody because he was charged with, or was under investigation

for, a violation of facility rules and there was a "need for increased control pending

disposition of charges or completion of the investigation." (Doc. 149, ¶ 6; Doc. 145,

at 10; Doc. 134, ¶ 27.)  He remained in administrative custody for approximately

three weeks.  (Doc. 145, ¶ 6; Doc. 149, ¶ 6; Doc. 151, ¶ 6.)  At the conclusion of the

investigation, he was released to general population because there was insufficient

evidence to issue a misconduct report.  (Doc. 134, ¶¶ 27-28; Doc. 151, ¶ 6.)

The claims that the removal from his cell on December 4, 2008, that resulted

in the December 8, 2008 transfer to the RHU by defendants Tress and Settle at the

direction of defendant Holtz, and the December 16, 2008 cell move by Eberling and

destruction of his Quran were retaliatory, are even further removed in time from

both the filing of the civil suit and the April 10, 2008 county court decision.

Therefore, he fails to satisfy the causal link prong and defendants are entitled to an

entry of summary judgment.

## B.    Exercise of Religion[2]

The First Amendment offers protection for a wide variety of expressive

activities.  See U.S. Const. amend I.  These rights are lessened, but not

---

[2]Although the plaintiff did not specifically raise a claim under the Religious
Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), the Court must
liberally construe the plaintiff's *pro se* pleadings and apply the applicable law,
regardless of whether he has mentioned it by name. See Dluhos v. Strasberg, 321
F.3d 365, 369 (3d Cir. 2003); see also Gray v. Occidental Life Ins. Co. of Cal., 387 F.2d
935, 936 (3d Cir. 1968).  Accordingly, the Court will address Green's free exercise
claim under both § 1983, which requires the Court to apply the Turner test, and
RLUIPA.

extinguished in the prison context, where legitimate penological interests must be considered in assessing the constitutionality of official conduct.  See Turner v. Safley, 482 U.S. 78, 89 (1987).  Although prisoners must be afforded "reasonable opportunities" to exercise their religious freedom guaranteed by the First Amendment, Cruz v. Beto, 405 U.S. 319, 322 n. 2 (1972), imprisonment necessarily results in restrictions on some constitutional rights, including the First Amendment's right to the free exercise of religion.  O'Lone v. Shabazz, 482 U.S. 342, 348-49 (1987).  It is well-established that only those beliefs which are (1) sincerely held, and (2) religious in nature are entitled to constitutional protection.  Wisconsin v. Yoder, 406 U.S. 205, 215-19 (1972); Dehart v. Horn, 227 F.3d 47, 51 (3d Cir. 2000); Africa v. Pennsylvania, 662 F.2d 1025, 1029-30 (3d Cir. 1981)(describing three indicia of religion (1) an attempt to address "fundamental and ultimate questions" involving "deep and imponderable matters"; (2) a comprehensive belief system; and (3) the presence of formal and external signs like clergy and observance of holidays.).  It is undisputed that Green's sincerely held religious beliefs are entitled to Constitutional protection.

       1.     Turner Analysis

Whether an inmate's free exercise of religion has been impermissibly burdened is governed by the four-part test set forth by the Supreme Court in Turner, 482 U.S. 78.  Specifically, Turner instructs courts to weigh four factors when applying this standard:  (1) whether the regulation bears a "valid, rational connection" to a legitimate and neutral governmental objective; (2) whether

prisoners have alternative ways of exercising the circumscribed right; (3) whether accommodating the right would have a deleterious impact on other inmates, guards, and the allocation of prison resources generally; and (4) whether alternatives exist that fully accommodate the prisoner's rights at *de minimis* cost to valid penological interests.  Id. at 89-91.

The first factor requires consideration of whether the restrictions on the plaintiff's religious rights bear a valid and rational connection to a legitimate and neutral objective.  Under this prong, courts accord great deference to the judgment of prison officials, who are charged with the "formidable task" of running a prison. Sutton v. Rasheed, 323 F.3d 236, 253 (3d Cir.2003) (quoting O'Lone, 482 U.S. at 353). The first factor is "foremost" in the Court's analysis, in that a rational connection is a "threshold requirement."  Id. (quoting Wolf v. Ashcroft, 297 F.3d 305, 310 (3d Cir. 2002)).  The second factor requires consideration of whether inmates have alternative means of exercising the constitutional right at issue.  In the free exercise context, the Court considers whether the inmate has other means of practicing his religion generally, not whether he has other means of engaging in any particular practice. Sutton, 323 F.3d at 255 (quoting DeHart, 227 F.3d at 55).  The third and fourth Turner factors focus on the specific religious practice or expression at issue and the consequences of accommodating the inmate for guards, for other inmates, and for the allocation of prison resources.  Sutton, 323 F.3d at 257 (quoting DeHart, 227 F.3d at 57).

Defendants Kendricks, Koharchik, Corbin and Lawler are entitled to an entry of summary judgment on this claim because Green has failed to establish that he suffered restrictions on his religious rights. When his Quran was thrown away on December 16, 2008 during a cell transfer, action was immediately taken by defendants Kendricks and Koharchik and by Iman Erogan to remedy the situation. He was immediately provided with a replacement Quran on December 17, 2008. Although it was not the precise version Green preferred, it is undisputed that he was given a Quran within one (1) day after he reported his Quran to be missing. He chose to reject the replacement Quran and wait for a preferred version. The following day, Kendrick communicated with Koharchik, who informed Kendrick that efforts were being made to replace the Quran with Green's preferred translation. Green filed a grievance and Lawler assured him that the efforts were being made to replace the Quran. In February 2009, Green filed another grievance because he had not yet received his new Quran. Defendant Lawler advised him that the Business Office's misunderstanding of the resolution of the original grievance resulted in a $38.00 credit to his inmate account rather than an order for a replacement Quran. The misunderstanding was resolved and a replacement Quran was ordered and received by Green sometime prior to April 21, 2009. (Doc. 134-3, at 16.) While it is evident that there was delay in procuring the preferred translation, there is simply nothing to lead this Court to conclude that Green's ability to practice his faith was restricted or that he was prohibited from practicing

his religion in any manner during this time period.  Therefore, defendants are entitled to an entry of summary judgment.

        2.      <u>Religious Land Use and Institutionalized Persons Act of 2000</u>

Section 3 of Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA") provides, in relevant part, that "[n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . even if the burden results from a rule of general applicability," unless the government establishes that the burden furthers "a compelling interest," and does so by the "least restrictive means."  42 U.S.C. § 2000cc-1(a)(1)-(2). RLUIPA defines "religious exercise" to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief."  42 U.S.C. § 2000cc-5(7)(A); <u>see also</u> <u>Cutter v. Wilkinson</u>, 544 U.S. 709, 715 (2005).

Although Congress intended that RLUIPA be construed "in favor of broad protection of religious exercise," <u>see</u> 42 U.S.C. § 2000cc-3(g), Congress also "anticipated that courts would apply the Act's standard with 'due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources.'"  <u>Cutter</u>, 544 U.S. at 723.  Congress indicated that in the event an inmate's request for religious accommodation would "become excessive, impose unjustified burdens on other institutionalized persons, or jeopardize the effective functioning of an institution, the facility would be free to resist the imposition."  <u>Id.</u> at 726.

Under RLUIPA, the plaintiff must show that his religious exercise has been burdened substantially by the challenged conduct. <u>Washington v. Klem</u>, 497 F.3d 272, 277-78 (3d Cir. 2007). The Third Circuit Court of Appeals has found that for the purposes of RLUIPA, a substantial burden exists where: "1) a follower is forced to choose between following the precepts of his religion and forfeiting the benefits otherwise generally available to other inmates versus abandoning one of the precepts of his religion in order to receive a benefit; of 2) the government puts substantial pressure on an adherent to substantially modify his behavior and to violate his beliefs. <u>Id.</u> at 280. If the plaintiff shows that prison administrators' action or inaction has imposed a substantial burden on the exercise of the plaintiff's religion, the prison administrator must establish that the challenged conduct furthers a compelling governmental interest and that it is the least restrictive means of furthering that interest. <u>Id.</u> at 283.

Green fails to establish that he suffered a substantial burden on the practice of his religion. Consequently, defendants will be granted summary judgment on the RLUIPA claim.

## C.   Due Process

### 1.   Fabricated Misconduct

Green alleges that his constitutional rights were violated when he was issued a fabricated misconduct on December 5, 2008. In <u>Heck v. Humphrey</u>, 512 U.S. 477 (1994), the Supreme Court ruled that a constitutional cause of action for damages does not accrue "for allegedly unconstitutional conviction or imprisonment, or for

other harm caused by actions whose unlawfulness would render a conviction or
sentence invalid," until the plaintiff proves that "the conviction or sentence has
been reversed on direct appeal, expunged by executive order, declared invalid by a
state tribunal authorized to make such determination, or called into question by a
federal court's issuance of a writ of habeas corpus." Id. at 486–87.  This rationale
was later extended to disciplinary proceedings.  Edwards v. Balisok, 520 U.S. 641
(1997).  As such, an inmate may not bring a civil rights action related to an inmate
disciplinary proceeding without first challenging and overturning, *via* appropriate
proceedings, the disciplinary hearing in question.  Id. at 646–47.  To summarize, "a
state prisoner's § 1983 action is barred (absent prior invalidation—no matter the
relief sought (damages or equitable relief), no matter the target of the prisoner's suit
(state conduct leading to conviction or internal prison proceedings)— if success in
that action would necessarily demonstrate the invalidity of the confinement or its
duration."  Wilkinson v. Dotson, 544 U.S. 74, 81–82 (2005).

Green seeks relief for allegedly false disciplinary charges that were filed
against him and resulted in a finding of guilt and disciplinary sanctions.  As any
type of award in Green's favor would call into question the validity of the
underlying disciplinary proceedings, he cannot state a claim unless he can
demonstrate that the decision finding him guilty of the misconduct charges was
invalidated on administrative appeal or through the issuance of a writ of habeas
corpus.  Because it is clear that he has not successfully challenged or invalidated
the proceedings at issue, he is unable to set forth facts that would support a

"plausible claim for relief," and summary judgment will be entered in favor of defendants.

        2.   <u>Notice</u>

At the December 9, 2008, misconduct hearing Green complained that he did not receive notice of the charges against him because he was not provided a copy of the misconduct twenty-four hours prior to the hearing. The Fourteenth Amendment of the United States Constitution provides in pertinent part that "No State shall . . . deprive any person of life, liberty, or property, without due process of law. . . ." The Due Process Clause does not provide protection against the imposition of discipline, including disciplinary confinement and the loss of various privileges inasmuch as these other forms of discipline do not "impose[ ] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." <u>Torres v. Fauver</u>, 292 F.3d 141, 150–51 (3d Cir. 2002) (citing <u>Sandin v. Conner</u>, 515 U.S. 472, 486 (1995)). Confinement in administrative or punitive segregation is insufficient, without more, to establish the kind of "atypical" deprivation of prison life necessary to implicate a liberty interest. <u>Sandin</u>, 515 U.S. at 486; <u>see</u> <u>Griffin v. Vaughn</u>, 112 F.3d 703, 706-07 (3d Cir. 1997).

Defendant Mitchell noted that because he was prohibited from having paperwork in the observation cell in the infirmary he was read the report and that under the circumstances, this constituted sufficient notice of the charges and proceeded with the hearing. He was found guilty and sanctioned to sixty days disciplinary custody. The disciplinary sanction at issue, sixty days of disciplinary

custody does not constitute "an atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." <u>Sandin</u>, 515 U.S. at 483; <u>see also</u>, <u>Smith v. Mensinger</u>, 293 F.3d 641 (3d Cir. 2001) (finding that seven months in disciplinary segregation is insufficient to trigger a due process violation).  Hence, Green has no protected interest and defendants are entitled to an entry of summary judgment.

### D.    Access to the Courts

Green alleges that on December 19, 2006, Trooper Sneath denied him the opportunity to pursue criminal charges when he threatened him into dropping the criminal complaint against Officer Montgomery.  Initially, this claim is barred by the statute of limitations.  As noted *supra*, the applicable statute of limitations for a § 1983 claim arising in Pennsylvania is two years, <u>Kach</u>, 589 F.3d at 634; <u>see</u> 42 Pa. Cons. State § 5524(2), and the cause of action accrues when a plaintiff knew or should have known he was harmed.  <u>See</u> <u>Garvin</u>, 354 F.3d 215 .  It is undisputed that Green's access to courts claim arose on December 19, 2006.  It is also undisputed that the complaint in this matter was filed on January 26, 2009.  Consequently, this claim is barred by the statute of limitations and defendant Trooper Sneath is entitled to an entry of summary judgment.

Green would fare no better if the claim were timely filed.  Prisoners have a constitutional right to "adequate, effective and meaningful" access to the courts. <u>Bounds v. Smith</u>, 430 U.S. 817 (1977).  In order to state a claim for a denial of the right of access to the courts, a plaintiff must also show actual injury.  <u>Lewis v.</u>

Casey, 518 U.S. 343 (1996).  The plaintiff must demonstrate that as a result of the defendant's actions, he lost the ability to present an "arguably actionable claim" against the validity of his sentence under direct or collateral appeal or a claim challenging his conditions of confinement in a civil rights action.  Id. at 355.  The "impairment of any other litigating capacity is simply one of the incidental (and perfectly constitutional) consequences of conviction and incarceration."  Id.  A plaintiff must allege both an underlying cause of action, whether anticipated or lost, and official acts frustrating the litigation.  Christopher v. Harbury, 536 U.S. 403 (2002).

As noted *supra*, "a private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another."  Linda R. S. v. Richard D., 410 U.S. at 619.  Accordingly, Green cannot demonstrate that he lost the ability to present an arguably actionable claim.

## IV.    Conclusion

Based on the foregoing, plaintiff's motion for summary judgment (Doc. 117) will be denied and defendants' cross motion for summary judgment (Doc. 133) will be granted.  Additionally, plaintiff's supplemental motion in limine (Doc. 110) and motion for an emergency injunction (Doc. 161) will be denied as moot.  An appropriate Order follows.

_ S/ Christopher C. Conner _
CHRISTOPHER C. CONNER
United States District Judge

Dated:      March 26, 2012

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **TYRONE GREEN,** | : | **CIVIL ACTION NO. 1:09-CV-0154** |
| **Plaintiff** | : | |
| | : | **(Judge Conner)** |
| **v.** | : | |
| | : | |
| **DET. SNEATH, et al.,** | : | |
| **Defendants** | : | |

## ORDER

AND NOW, this 26th day of March,  2012, upon consideration of plaintiff's

motion for summary judgment (Doc. 117) and defendants' cross motion for

summary judgment (Doc. 133), and for the reasons set forth in the accompanying

memorandum, it is hereby ORDERED that:

1. Plaintiff's motion for summary judgment (Doc. 117) is DENIED.

2. Defendants' cross motion for summary judgment (Doc. 133) is GRANTED.

3. The Clerk of Court is directed to ENTER judgment in favor of defendants and against plaintiff.

4. Plaintiff's supplemental motion in limine (Doc. 110), motion for an emergency injunction (Doc. 161), motion for supplemental complaint (Doc. 162), and motion for discovery (Doc. 164) are DENIED as moot.

5. The Clerk of Court is directed to CLOSE this matter.

6. Any appeal from this order is DEEMED frivolous and not in good faith. See 28 U.S.C. § 1915(a)(3).

   S/ Christopher C. Conner
CHRISTOPHER C. CONNER
United States District Judge